IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ORENTON B. HILL,                              3:11-CV-00838-BR

      Plaintiff,

                                    OPINION AND ORDER

v.

J. CORYELL, in his individual
capacity as a TRIMET Fare
Inspector, and TRI-COUNTY
METROPOLITAN TRANSPORTATION
DISTRICT OF OREGON, an Oregon
public corporation,

      Defendants.


**ORENTON B. HILL**
8316 N. Lombard, PMB #400
Portland, OR 97203
(503) 283-0581

      Plaintiff, *Pro Se*

**KIMBERLY A. SEWELL**

1 - OPINION AND ORDER

**ERIK VAN HAGEN**
Tri-County Metropolitan
Transportation District of Oregon
4012 S.E. 17th Avenue
LS3
Portland, OR 97202
(503) 962-5656

      Attorneys for Defendants

**BROWN, Judge.**

    This matter comes before the Court on Plaintiff's Motion (#46) to Reopen Case and Defendants' Cross-Motion (#60) to Enforce Settlement Agreement.  For the reasons that follow, the Court **DENIES** Plaintiff's Motion and **GRANTS** Defendants' Motion.

## FACTUAL BACKGROUND

    The following facts are taken from Plaintiff's Third Amended Complaint:

    On March 9, 2010, Plaintiff Orenton Hill, an African-American senior citizen, boarded a bus operated by Defendant Tri-County Metropolitan Transportation District (Tri-Met).  Shortly thereafter Defendant J. Coryell, a fare inspector for Tri-Met, boarded the same bus and began to verify passengers' fares.

    Coryell sought to verify the fare of an elderly white passenger who presented an Honored Citizen monthly bus pass.  Coryell verified the fare without asking for proof of age or eligibility for the Honored Citizen pass.

2 - OPINION AND ORDER

Coryell then sought to verify Plaintiff's fare. Plaintiff presented his Honored Citizen bus pass, and Coryell moved on to other passengers.

After verifying other passengers' fares, Coryell returned to Plaintiff and asked him to present identification to prove his eligibility for the Honored Citizen pass. Plaintiff advised Coryell that he had an expired Oregon identification card and a valid Medicare card to prove eligibility. Coryell ignored Plaintiff's statement about his Medicare card and insisted Plaintiff present an identification card.

Coryell was not satisfied with Plaintiff's proof of fare and identification, instructed the bus driver not to leave, and summoned the Portland Police.[1] "A few moments later" a Portland Police Officer boarded the bus, asked Plaintiff for identification, and asked Plaintiff to deboard the bus.

At that point another elderly passenger advised Coryell that she could vouch for Plaintiff because they both lived in the same apartment complex, which rents only to senior citizens. Coryell ignored her and asked Plaintiff to deboard the bus. Plaintiff deboarded the bus "because he felt he had no other choice."

A Portland Police Officer "on the scene" asked Plaintiff for identification. By that time Plaintiff had found his Medicare

---

[1] The Portland Police Bureau and its officers are not Defendants in this action.

3 - OPINION AND ORDER

card.  Plaintiff gave the officer his expired Oregon identification card and his Medicare card.  The officer gave both items to Coryell.

"By that time, [Plaintiff] was surrounded by five Portland Police officers and two additional fare inspectors."  Plaintiff began to feel extreme anxiety.

After "a while" Coryell issued Plaintiff a Tri-Met citation and Notice of Exclusion of Interference/Trespass.  Coryell and the police officers told Plaintiff that he was free to leave, but he could not ride any bus during the period of exclusion.

A few days after the incident Plaintiff suffered a dizzy spell at home, which caused him to fall and to sustain injuries.  Plaintiff's treating physician "related the cause of the dizzy spell to the stress of the incidents described."

## PROCEDURAL BACKGROUND

On April 15, 2011, Plaintiff filed a complaint in Multnomah County Circuit Court against Tri-Met alleging claims for discrimination in a place of public accommodation in violation of Oregon Revised Statute § 659A.403, intentional infliction of emotional distress (IIED), and false arrest/imprisonment.

On July 5, 2011, Plaintiff filed an amended complaint in Multnomah County Circuit Court against Tri-Met alleging claims for (1) public facility discrimination in violation of Title II

4 - OPINION AND ORDER

of the Civil Rights Act, 42 U.S.C. § 2000b, *et seq.*; (2) violation of his Fourth and Fourteenth Amendment rights to be free from unreasonable seizure under § 1983; (3) state-law false imprisonment; and (4) IIED.

 On July 13, 2011, Tri-Met removed the matter to this Court on the basis of original jurisdiction.

 On July 20, 2011, Tri-Met filed a Motion to Dismiss the first two claims of Plaintiff's First Amended Complaint on the ground that Plaintiff failed to state a claim upon which relief can be granted.

 On August 1, 2011, without filing a motion or seeking permission of the Court, Plaintiff filed a Second Amended Complaint in this Court adding Coryell as a defendant and asserting claims (1) under § 1983 for violation of 42 U.S.C. § 2000b, *et seq.*, against Coryell only; (2) for IIED against both Defendants; and (3) for false imprisonment against both Defendants.

 On August 3, 2011, Plaintiff filed a Response to Tri-Met's Motion to Dismiss Plaintiff's First Amended Complaint.

 On August 15, 2011, Defendants filed an Unopposed Motion to Dismiss the Second and Third claims of Plaintiff's Second Amended Complaint (for IIED and false imprisonment) against Coryell individually.

 On August 15, 2011, Defendants filed a Motion to Dismiss

5 - OPINION AND ORDER

Plaintiff's Second Amended Complaint on the grounds that (1) Plaintiff may not bring a claim for compensatory damages for violation of § 2000b and (2) Plaintiff failed to state claims for IIED or false imprisonment.

On August 17, 2011, Tri-Met filed a Reply to its Motion to Dismiss Plaintiff's First Amended Complaint.

On August 19, 2011, the Court granted Defendants' Unopposed Motion to Dismiss the Second and Third claims of Plaintiff's Second Amended Complaint.

On November 9, 2011, the Court held a hearing to determine the claims on which Plaintiff intended to proceed. At the hearing the Court advised Plaintiff that he improperly filed his Second Amended Complaint without permission of the Court, that Plaintiff had not established he could bring a claim under § 2000b-2 pursuant to § 1983, and that it was questionable whether Plaintiff had stated a claim for IIED. The Court directed Plaintiff to file a supplemental memorandum that (1) addressed Plaintiff's assertion that he could bring an action for monetary damages for violation of § 2000b-2 pursuant to § 1983, (2) addressed whether Plaintiff intended to proceed under § 1983 for violation of his rights under the Fourth or Fourteenth Amendment, (3) presented the law and facts to support any claim for a constitutional violation, and (4) specified the facts in this case that would support a claim for IIED. The Court further

advised Plaintiff that it would consider whether to allow Plaintiff to file a third amended complaint after it reviewed his supplemental memorandum.

On November 29, 2011, Plaintiff filed a Supplemental Memorandum in which he advised the Court that he was withdrawing his claim for violation of § 2000b-2 and that he would bring claims for violation of his rights under the Fourth Amendment and intentional infliction of emotional distress if he was permitted to file a third amended complaint.

On December 15, 2011, Defendants filed a Sur-Reply in which they contended Plaintiff's proposed amendment would be futile because (1) Plaintiff had not alleged facts sufficient to state a claim for violation of his rights under the Fourth Amendment and (2) Plaintiff continued to allege facts that were not sufficient to state a claim for IIED.

On March 13, 2012, the Court heard oral argument on Defendants' Motions to Dismiss both of Plaintiff's Complaints. The Court granted Defendants' Motions and granted Plaintiff leave to file a third amended complaint.

On March 30, 2012, Plaintiff filed a Third Amended Complaint against Coryell and Tri-Met in which he alleged claims for (1) violation of his Fourth Amendment right to be free from unreasonable seizure under § 1983 and (2) state-law false arrest/imprisonment.

On April 20, 2012, Defendants filed an Answer to Plaintiff's Third Amended Complaint.

On September 24, 2012, Plaintiff's counsel, Gerald Noble, emailed defense counsel, Kimberly Sewell, a demand letter.

On September 27, 2012, Sewell responded to the demand letter via email, noted the parties were "miles apart," and stated she believed they would not settle.  Noble responded and suggested Sewell "propose a counter offer.  If possible I would like to resolve this case."  Decl. of Kimberly Sewell, Ex. 2 at 1.

Sewell testifies in her Declaration that she had several telephone conversations with Plaintiff's counsel throughout September 2012 regarding settlement.  Ultimately Defendants offered Plaintiff $2,000 without an annual bus pass and inclusive of costs and fees to settle.  Noble advised he would convey the offer to Plaintiff.  Noble then informed Sewell that Plaintiff wanted to discuss the offer with his daughter and Noble would get back to Sewell.

"Within the next couple of days" Noble called Sewell and indicated Plaintiff had agreed to settle the case under the terms proposed by Sewell.  Sewell advised Noble that she would get the check issued, draft the settlement paperwork, and send the paperwork to Noble.

On October 31, 2012, Sewell emailed Noble noting "[t]his is to confirm that we have settled the [action] for a total of

8 - OPINION AND ORDER

$2,000. That figure is inclusive of any costs, fees, medical bills/liens, etc. I will order the check and draft the appropriate paperwork. I'll try to send that out by next week." Sewell Decl., Ex. 4 at 1. Noble responded "Thanks."

On November 5, 2012, Sewell advised the Court that the parties had settled the matter, were "in the process of exchanging the settlement documents," and agreed the Court should issue a 60-day Dismissal Order. Sewell Decl., Ex. 5 at 1.

On November 5, 2012, the Court issued a 60-day Order of Dismissal as follows:

> The Court having been informed by counsel for the parties that this action has been settled, IT IS ORDERED that, pursuant to LR 41-1, this action is dismissed with prejudice and without costs and with leave, upon good cause shown within sixty (60) days, to have this order of dismissal set aside and the action reinstated if the settlement is not consummated.

On November 7, 2012, Plaintiff drafted a letter to Noble noting Noble had advised Plaintiff to settle because Noble was "99.9% sure that Tri-Met would win" and that Noble would withdraw representation if Plaintiff wanted to proceed rather than settle. Plaintiff advised Noble that he "will be continuing [this action] because I am not of the same persuasion."

On November 9, 2012, Noble emailed Sewell and advised her that Plaintiff "has decided that he does not want to settle the case." Accordingly, Noble would file a Motion to Reopen.

On November 10, 2012, Plaintiff filed a Motion to Reopen

9 - OPINION AND ORDER

Case. In his Declaration Noble testifies "[t]he parties were in agreement that this matter would settle," but "[p]rior to consummating the Settlement, [Plaintiff] changed his mind and decided that he does not want to settle this matter." Decl. of Gerald Noble at ¶¶ 2, 4.

On November 13, 2012, Sewell returned from vacation and advised Noble via email that "[w]e had a settlement agreement and based on that, I did not file a motion for summary judgment. Your client has now breached the settlement agreement and reinstated the case." Sewell Decl., Ex. 6 at 1.

On November 26, 2012, Plaintiff drafted a letter to Noble noting: "This letter is written as a official second notice to let you know, and finally establish as a matter of public record, that you or your firm no longer represent me in any way, form or fashion in the . . . matter."

On November 30, 2012, Noble filed a Motion to Withdraw.

On December 4, 2012, the Court granted Noble's Motion.

On February 1, 2013, Defendants filed a Cross-Motion to Enforce Settlement Agreement.

On February 22, 2013, Plaintiff, proceeding *pro se*, filed a combined Response to Defendants' Motion and Reply in support of his own Motion.

On March 8, 2013, the Court heard oral argument on the parties' Motions.

10 - OPINION AND ORDER

**DISCUSSION**

When deciding issues of contract formation, federal courts apply state law rather than federal common law. *See, e.g., Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003)(contract formation is a substantive issue and state contract law applies to the issue of formation).

Under Oregon law whether a contract exists is a question of law. *Dalton v. Robert Jahn Corp.*, 209 Or. App. 120, 132 (2006) (citation omitted). An agreement to settle an action can constitute a valid and enforceable contract.

> In Oregon
>
> > as to a contract's essential terms, a valid contract exists . . . when there is a meeting of the minds and where all terms are either agreed upon or there is a method agreed upon by which open and disputed terms can be settled, such that nothing is left for future negotiation.

*Id.* (citing *Phillips v. Johnson*, 266 Or. 544, 555-56 (1973)). "Oregon subscribes to the objective theory of contracts. In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts." *Id.* (quotation omitted). "In Oregon . . . settlement agreements are enforceable once agreed upon, unless the parties intend their agreement to become enforceable only after it is reduced to writing." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004)(citation omitted). *See also Hughes v. Misar*, 189 Or. App. 258, 264

11 - OPINION AND ORDER

(2003)("When parties agree on the essential terms of a contract and there is nothing left for future negotiations, the fact that they also intended there to be a future writing that expresses their agreement more formally does not affect the immediately binding nature of the agreement.").

Here the record reflects an offer by Sewell and acceptance of the settlement by Noble. Sewell memorialized the terms of the parties' settlement agreement in her October 31, 2012, email. Noble confirmed the parties' agreement in his November 1, 2012, email. In addition, the parties advised the Court of the settlement on November 5, 2012. There is not any indication that the parties did not intend the settlement to be enforceable until it was reduced to writing. In fact, the record suggests the parties intended the settlement agreement to be binding on October 31 or November 1 and that the documents were a mere formality to "serve the purpose of a memorial of a completed contract already made." *See Dalton*, 209 Or. App. at 136. Accordingly, "the failure to execute the writing does not prevent the existing agreement from binding the parties." *Id*.

In similar circumstances the Oregon Court of Appeals did not have any "difficulty concluding that the parties agreed to settle." *In re Marriage of Baldwin,* 215 Or. App. 203, 207 (2007).

On June 9, 2006, Diane's attorney e-mailed a "final" settlement proposal to Karen's attorney. That proposal stated that Karen, or her assignee, would receive one-third of the disputed amount and Diane would retain two-thirds of the disputed PERS benefits. In addition, Diane agreed to make the settlement fully retroactive. On June 13, 2006, Karen's attorney e-mailed Diane's attorney that Diane's June 9, 2006 offer was "acceptable to Karen" and that a formal acceptance would follow. On June 20, 2006, Diane's attorney e-mailed Karen's attorney confirming Karen's acceptance of Diane's June 9 offer. On June 26, 2006, Karen's attorney wrote Diane's attorney "confirm[ing] that we have agreed to settle the parties' dispute about the distribution of John Baldwin's PERS account." After noting that the domestic relations order would need to be amended, Karen's attorney wrote that, "assuming that the rest of the deal is consummated, we will agree to dismiss the appeal."

A different attorney was responsible for drafting an amended domestic relations order. Over the next few months, the attorneys exchanged e-mails regarding the proposed order. On August 2, 2006, Karen's attorney wrote Diane's attorney, expressing some concern regarding paragraph eight of the proposed order. However, Karen's attorney wrote that it was Diane's attorney's "call" regarding paragraph eight, and that "the rest of the order looks okay to me." That same day, Diane's attorney wrote to Karen's attorney regarding the changes to the proposed order. On September 20, 2006, Karen's attorney wrote Diane's attorney stating, "[p]lease let me know whether the present DRO will be acceptable. We also want to get this wrapped up—or not—as soon as possible." On November 14, 2006, Diane's attorney e-mailed Karen's attorney stating that Diane was ready to sign the proposed order, with two exceptions. The exceptions concerned paragraph eight regarding the manner and timing of the retroactive payment, and paragraph nine regarding taxability. According to Diane's attorney, the retroactive payment issue was resolved, and he suggested deleting paragraph nine. Diane's attorney asked Karen's attorney if the two changes

13 - OPINION AND ORDER

>> were acceptable.  There was no response to Diane's
>> attorney's e-mail.  On December 5, 2006, Karen
>> filed a substitution of attorney.  Karen's new
>> attorney informed Diane's attorney that Karen did
>> not want to settle and that she wanted the appeal
>> to go forward.

*Id*. at 206-07.  As noted, the Oregon Court of Appeals found the

parties had consummated an agreement to settle.  The court

reasoned:

>> The June 2006 exchange of e-mails between the
>> parties' attorneys constituted the making of a
>> contract.  Diane's attorney's letter of June 9 to
>> Karen's attorney was an offer, and Karen's
>> attorney's response was an acceptance of that
>> offer.  Karen's attorney even wrote that a more
>> formal "acceptance" would follow, and Karen's
>> attorney's June 26, 2006, letter was that formal
>> acceptance.  The exchange of e-mails between the
>> attorneys for the parties demonstrated the
>> requisite agreement on the same essential terms of
>> the settlement.
>>
>> The lack of a signed agreement is not dispositive;
>> "[w]hen parties agree on the essential terms of a
>> contract and there is nothing left for future
>> negotiations, the fact that they also intended
>> there to be a future writing that expresses their
>> agreement more formally does not affect the
>> immediately binding nature of the agreement."
>> *Hughes*, 189 Or. App. at 264, 76 P.3d 111; *see also
>> Kaiser Foundation Health Plan v. Doe*, 136 Or. App.
>> 566, 903 P.2d 375 (1995), *modified on recons*., 138
>> Or. App. 428, 908 P.2d 850, *rev. den*., 324 Or.
>> 394, 927 P.2d 600 (1996)(Where attorneys reached
>> agreement on the essential terms of a settlement
>> and the defendant accepted those terms, the
>> defendant's acceptance was sufficient to make the
>> settlement immediately binding.).

*Id*. at 207-08.

At oral argument Plaintiff asserted he did not agree to

settle the matter and he did not advise Noble that he had agreed

14 - OPINION AND ORDER

to settle the matter.  Plaintiff, however, conceded he was not involved in Noble's negotiations with Sewell and that Noble represented Plaintiff in all matters before this Court at the time that Noble communicated agreement of the settlement to Sewell.

In *Kaiser Foundation Health Plan of the Northwest v. Doe*, 136 Or. App. 566 (1995), the defendant alleged she had been sexually harassed by a doctor employed by the plaintiff.  The defendant filed a grievance with her union and a complaint with the Oregon Bureau of Labor and Industry (BOLI).  The defendant agreed to mediate with a private mediator, but the defendant rescinded the oral agreement reached during mediation by her counsel.  The plaintiff filed a complaint seeking a declaration that the parties had entered into an enforceable oral settlement agreement and sought specific enforcement of agreement.  The trial court concluded the agreement was unenforceable.  The Oregon Court of Appeals reversed and held, among other things, that "even if [the defendant] was unaware of some of the terms in the offer, [she] had vested [counsel] with apparent authority to bind her."  *Id*. at 573.  Thus, when apparent authority is established, a settlement agreement entered into by counsel is enforceable even if the client attempts to rescind the agreement.

The court noted in *Doe* that "[a]ctual authority is either express or implied.  Express authority is that authority that the

15 - OPINION AND ORDER

principal confers upon the agent in express terms.  The express authority to do a certain thing carries with it the implied authority to do those other things that are reasonably necessary to carry out the authorized task."  *Id*. at 573 n.3 (citation omitted).  Moreover,

> [a] principal is bound by the acts of its agent when the acts are within the scope of the agent's real or apparent authority.  *Roby's Enterprises v. Hanover Development Corp*., 67 Or. App. 594, 599, 679 P.2d 871 (1984).  In this case, there is ample evidence from defendant's objective manifestations to indicate that she gave [counsel] actual authority to accept the settlement offer, not just to tell plaintiff to draft a proposed agreement. *See also Kitzke v. Turnidge*, 209 Or. 563, 573, 307 P.2d 522 (1957) ("The law of contracts is not concerned with the parties' undisclosed intents and ideas.").

*Id*. at 573.

As noted, Noble was Plaintiff's counsel and, therefore, his agent in this matter for at least 18 months.  Noble filed the Complaint in this matter on Plaintiff's behalf, litigated two Motions to Dismiss, and attended numerous hearings on behalf of Plaintiff.  Noble represented to Sewell that he had the authority to settle this matter, and there is not any evidence in the record that Noble did not have that authority.

On this record the Court concludes Noble had apparent authority to settle this action.  In addition, Noble and Sewell reached a binding and enforceable settlement in the amount of $2,000 "inclusive of any costs, fees, [and] medical bills/liens."

16 - OPINION AND ORDER

Accordingly, the Court denies Plaintiff's Motion to Reopen Case and grants Defendants' Cross-Motion to Enforce Settlement Agreement.

## CONCLUSION

For these reasons, the Court **DENIES** Plaintiff's Motion (#46) to Reopen Case and **GRANTS** Defendants' Cross-Motion (#60) to Enforce Settlement Agreement.

IT IS SO ORDERED.

DATED this 30th day of April, 2013.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

17 - OPINION AND ORDER